UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160(2) (NEB)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DANTRELL JOHNSON
a/k/a "Trell Moe,"

        Defendant.

**GOVERNMENT'S SENTENCING POSITION**

*"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

For over 20 years, the Highs street gang attempted to hijack much of north Minneapolis. It converted public spaces into open-air drug markets, preyed on vulnerable youths, and normalized the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

The Highs and Lows were engaged in a vicious war that resulted in death and destruction not only to perceived rivals, but to innocent bystanders caught in the crossfire. Defendant Dantrell Johnson must account for the work he "put in" to benefit the Highs enterprise by aiding and abetting multiple shootings and a murder on behalf of the gang. The government respectfully submits that a life sentence is appropriate in this case.

## The Highs Criminal Enterprise

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:



*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows have engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise. Its members resort to any crime—murder, kidnapping, arson, robbery, bribery, extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:



*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and Walgreens have been essentially open-air drug markets.[1] The Highs stranglehold on

---

[1] This Walgreens location has since closed, in part due to the Highs activities in and around its location. This is a representative example of how the enterprise can affect the economic health of communities.

this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:



*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community. Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 "shots fired" calls;
- 20,265 ShotSpotter activations;
- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product—requires no introduction. According to the Minnesota Department of Health, in 2022,

Minnesota reported 4,228 non-fatal opioid-involved overdoses.[2] Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[3] Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[4] Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident. The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

### Dantrell Johnson's Offense Conduct

Violence was not incidental to the Highs. It was the foundation of their identity and their method of enforcing dominance. Within this structure, Dantrell Johnson aligned himself with and embraced that culture fully. On August 8, 2021, Johnson enabled and amplified the coordinated acts of retaliatory violence that culminated in the attempted murder of Arequise Morgan and the murder of Darryl Wells.

---

[2] Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.

[3] *Id.*

[4] Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

*Attempted Murder of Arequise Morgan*

On August 7, 2021, prominent Highs member Prince Martin was shot and killed at Winner Gas Station. ECF No. 2337 (PSR) at ¶18. The following day, Highs members gathered at the gas station for a memorial. *Id.* Among them were Dantrell Johnson, Keon Pruitt, and Gregory Hamilton. *Id.* As proven at trial, Martin's killing immediately triggered expectations among Highs members to retaliate. ECF No. 1947 (Transcript of Jovan Knight Testimony). Johnson, armed and present among core members, aligned himself with this retaliatory mandate when he drove Hamilton, also armed, into Lows territory later that day. Trial Exhibit D-3A.



*Figure 4: Johnson (R) walks to his Volkswagen van with Hamilton (L) before driving into Lows territory.*

The pair left the memorial in Johnson's Volkswagen van and drove directly to Wally's Foods, a known Lows hangout. Trial Exhibits D-2A, D-3A; PSR at ¶19. Surveillance video shows them driving past rival gang member Arequise Morgan. Trial Exhibit D-4, D-4A. Johnson positioned the vehicle so that Hamilton could fire out the window. *Id*. Hamilton then shot Morgan in the back, and Johnson immediately fled the scene, returning to Winner Gas Station. *Id*.



*Figure 5: Johnson drives Hamilton to Wally's Foods, where Hamilton fires at Lows member Arequise Morgan.*

*Murder of Darryl Wells*

Approximately two hours after Johnson drove Hamilton to Wally's to shoot a Low, he joined a second coordinated operation, this time killing Darryl Wells, an innocent man with no gang affiliation. PSR at ¶¶20, 25. At approximately 7:48 p.m., Wells arrived at the Skyline Market in Lows territory. *Id*. at ¶¶20, 21. Within one minute, Johnson arrived with Hamilton in a Dodge Charger driven by fellow Highs member

8

William Johnson and parked directly behind Well's car. *Id.* Johnson followed Hamilton out of the car and into the store after Wells. Trial Exhibit E-2, E-2A.



*Figure 6: Johnson enters the Skyline Market seconds after Hamilton entered.*

Inside the market, Johnson and Hamilton split up down different aisles positioning themselves to block escape routes and isolate Wells *Id.* Johnson then confronted Wells in an aisle and drew two firearms. PSR at ¶ 22.



*Figure 7: Johnson aims two firearms at a fleeing Wells inside the public store.*

9

When Wells ran, Johnson immediately opened fire with both firearms, which caused Wells to fall. *Id.*; Trial Exhibit E-5, E-5A. As Wells tried to stand and run out the door, Johnson continued to chase after him. *Id.*



*Figure 8: Johnson fires at Wells as he flees, causing Wells to fall.*

Wells managed to escape onto Glenwood Avenue, running toward a Porsche driven by Pruitt. PSR at ¶ 23. Seconds later, both Johnson and Hamilton ran from the store, aimed their firearms at a still fleeing Wells, and opened fire again. *Id.* Johnson and Hamilton then returned to the Charger and fled the scene, leaving the remainder of the killing to the armed juveniles their group had brought along. *Id.* at ¶¶ 23-24.

10



*Figure 9: Johnson continues to fire at a still fleeing Wells.*

As this occurred, the Porsche continued pursuing the Wells. PSR at ¶ 24. Two juvenile Highs members armed with firearms exited the vehicle, ran into an alley where Wells had collapsed, and fired multiple rounds at close range, killing him. *Id.* Forensic evidence connected the earlier Morgan shooting that Johnson facilitated with the Skyline Market murder. PSR at ¶ 26. Shell casings from the Morgan scene matched those recovered from the alley where Wells was killed. *Id.*

## The Presentence Investigation Report

The Presentence Investigation Report calculated an advisory range of life imprisonment, and the facts fully justify such a sentence. PSR at ¶ 111. Johnson raised several factual objections, none of which require a ruling as they will not affect sentencing. ECF No. 2308; *see also* Fed. R. Crim. P. 32(i)(3)(B). A possible departure for "over-represented" criminal history was identified under U.S.S.G. §4A1.3(b),

11

comment (n.3(A)(ii)) that does not impact the Guideline. *Id.* at ¶ 131. The government did not object to the PSR's Guidelines calculations.

## The Appropriate Sentence

Johnson was not a peripheral associate of this enterprise. He participated in the retaliatory operations of the gang not only as a driver but as an armed enforcer, using firearms in public areas without hesitation. Like Hamilton, Johnson's conduct reflects loyalty to the gang's most dangerous expectations, participation in premeditated multi-step retaliation, a willingness to fire weapons in public places with zero regard for bystanders, and an absolute indifference to human life. The government submits that a life sentence is not only warranted but necessary under 18 U.S.C. § 3553(a). No lesser sentence can capture the gravity of Johnson's conduct, the threat he poses to the public, or the need to deter the devastating gang violence.

### A. The Applicable Law

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and

"the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

### B. The 3553(a) Factors

#### 1. Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant a life sentence. In the span of a single afternoon, Johnson drove the vehicle used in a targeted attempted murder in Lows territory. He then armed himself with two firearms and helped carry out an ambush inside a public market where he fired at an unarmed, fleeing victim. These are not the actions of someone caught up in a moment. They are the actions of someone who had already decided that another human being would die that night.

Most aggravating is the retaliatory motive behind the violence, intended to elevate gang status. Johnson was not defending himself or responding to any threat. He was fulfilling a gang expectation of revenge. Evidence at trial proved that Johnson armed himself following the death of a fellow gang member, traveled to rival territory, identified perceived rivals, facilitated another to shoot or himself fired first, and chased a wounded man into the street intending to finish the directive to kill. Under these circumstances, § 3553(a)(1) weighs overwhelmingly in favor of the maximum penalty. A life sentence is the only punishment proportionate to the brutality, deliberation, and moral depravity of the Johnson's conduct.

13

Johnson's personal history does not mitigate the offense. If anything, it exacerbates the need for a life sentence. Johnson's criminal history is long, escalating, and dominated by violence beginning in adolescence. *See* PSR at ¶¶ 47-76. His history reflects repeated assaults, patterned disregard for legal authority, a demonstrated comfort with weapons, and a trajectory toward lethal violence. Far from aging out of crime, Johnson graduated into gang-organized murder. Nothing in his background suggests coercion, immaturity, or impulsivity mitigated his actions. To the contrary, Johnson made calculated decisions, brought firearms, acted as a driver and aggressor, and executed gang-directed retaliation. His characteristics, which include loyalty to a violent gang, leadership in retaliatory acts, and willingness to kill, make clear that the risk he poses to the community is extreme and persistent. Nothing in Johnson's history suggests he will ever abandon gang-based violence. The § 3553(a)(1) inquiry therefore supports a life sentence.

### 2. The Need for the Sentence to Reflect Seriousness, Promote Respect for the Law, and Provide Just Punishment

The murder of an innocent man under these circumstances calls for the most severe punishment. Johnson helped carry out a coordinated gang killing intended to restore the Highs' reputation after "King Boo" was murdered. He did so after facilitating the attempted murder of a rival gang member earlier the same day. A sentence less than life would fail to reflect the extraordinary gravity of this offense. It would minimize the intentional taking of an innocent life, the terror inflicted on the community, and the deliberate nature of this premeditated execution. A lesser sentence would not promote

respect for the law and would inadequately reflect the seriousness of the offense and the value of the life that was taken.

### 3. Deterrence— General and Specific

The Highs thrived on spectacle and fear. Posting, boasting, and retaliating to project dominance. They glorified violence and measured loyalty in blood. Johnson's conduct sends a message within gang culture that retaliatory killings elevate status. A life sentence must send the counter-message that brazen, open-air, disrespect for the law that takes human life and leaves entire communities shattered will be met with commiserate consequences. That message is essential to interrupt the calculus that glorifies violence as a path to status. Moreover, Johnson's lifelong trajectory of violence shows that prior interventions did nothing, that present confinement has not led to acceptance of responsibility, and that nothing short of life imprisonment will prevent further violence.

### 4. Protection of the Public

Johnson presents an extraordinary danger to the public. His willingness to fire guns in public demonstrates that no community can be safe if he is released. His criminal escalation, from robberies and assaults to firearm-enabled ambush murders, shows that prison alone does not deter him. A life sentence is essential because Johnson's crimes were part of a pattern within an organized criminal enterprise. Like Hamilton, Johnson is exactly the type of offender who warrants a life sentence for racketeering murder: an individual for whom violence is purposeful, escalating, and driven by loyalty to a criminal enterprise. Respect for the law cannot be restored unless

15

the sentence reflects the seriousness of murdering an innocent man as part of a gang's retaliatory mission.

### 5. Avoiding Unwarranted Disparities

A life sentence aligns with the culpability of the highest-impact Highs offenders who coordinate, drive, and shoot and differentiates them from lesser participants. Anything less would invert proportionality by treating a hands-on enterprise shooter/driver more favorably than those with narrower roles.

### Conclusion

The Court must impose a sentence sufficient, but not greater than necessary to serve the purposes of sentencing. In a case defined by planned retaliation, public terror, and the murder of an uninvolved citizen, only life imprisonment satisfies the factors outlined in 18 U.S.C. § 3553(a). Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, powerfully deters, and most critically protects the public from a proven, unrepentant enterprise shooter.

For all these reasons, the government respectfully submits that a Guidelines sentence of life imprisonment fully comports with the United States Sentencing Guidelines and the factors of 18 U.S.C. § 3553(a).

Dated: December 4, 2025                    Respectfully Submitted,

                                                   DANIEL A. ROSEN
                                                   United States Attorney

                                                 */s/ Albania Concepcion*
                                                 Albania Concepcion (ID: 0401536)
                                                 Assistant United States Attorney