UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 23-cr-160 (NEB/JFD) |
| Plaintiff, | ) | |
| v. | ) | |
| Tyreese Giles(6), Josiah Taylor(7), Trevaun Robinson(10), William Banks(19), Gregory Brown(26), | ) | Courtroom 13W Minneapolis, Minnesota Wednesday, May 14, 2025 9:21 a.m. |
| Defendants. | ) | |

---

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME III - JURY TRIAL PROCEEDINGS**
**EXCERPT OF TESTIMONY OF LOUIS CHAVEZ**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography; Transcript produced by computer.

* * *

APPEARANCES:

For the Plaintiff: UNITED STATES ATTORNEY'S OFFICE
BY: THOMAS CALHOUN-LOPEZ
CARLA BAUMEL
300 South Fourth Street, #600
Minneapolis, Minnesota 55415

DEPARTMENT OF JUSTICE
ORGANIZED CRIME AND GANG SECTION
BY: BRIAN W. LYNCH
ALYSSA LEVEY-WEINSTEIN
1301 New York Avenue NW, #700
Washington, D.C. 20530

For the Defendant Tyreese Giles(6): RIVERS LAW FIRM, P.A.
BY: BRUCE RIVERS
701 Fourth Avenue South, #300
Minneapolis, Minnesota 55415

For the Defendant Josiah Taylor(7): WOLD LAW
BY: PETER B. WOLD
JOHN FEE
331 Second Avenue South, #705
Minneapolis, Minnesota 55401

For the Defendant Trevaun Robinson(10): PAUL ENGH, ATTORNEY AT LAW
BY: PAUL C. ENGH
150 South Fifth Street, #2860
Minneapolis, Minnesota 55402

For the Defendant William Banks(19): CATHERINE TURNER, ATTORNEY AT LAW
BY: CATHERINE L. TURNER
331 Second Avenue South, #705
Minneapolis, Minnesota 55401

For the Defendant Gregory Brown(26): NORTH STAR LAW GROUP PLLC
BY: DANIEL S. ADKINS
1295 Bandana Boulevard North, #335
St. Paul, Minnesota 55108

* * *

MR. LYNCH: The government calls Louis Chavez.

THE COURT: Raise your right hand for me.

LOUIS CHAVEZ,

called on behalf of the government, was duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Thank you. You may be seated.

THE WITNESS: Thank you.

THE COURT: When you are settled, please state and spell both your first and last name for the record.

THE WITNESS: My name is Louis Chavez. L-O-U-I-S. C-H-A-V-E-Z.

THE COURT: Thank you.

You may inquire.

MR. LYNCH: Thank you.

DIRECT EXAMINATION

BY MR. LYNCH:

Q. Good morning.

A. Good morning.

Q. Are you currently employed?

A. Yes.

Q. And where are you employed?

A. I'm employed in Phoenix, Arizona.

Q. And who are you employed with?

A. I'm employed with the Drug Enforcement Administration,

also known as the DEA.

Q. And what's your position with the DEA?

A. I'm currently a senior forensic chemist with the DEA.

Q. And how long have you been a forensic chemist with the DEA?

A. I began working for the DEA in January of 2017. So a little over eight years.

Q. What type of training and education do you have qualifying to be a forensic chemist with the DEA?

A. I have a bachelor's of science in biochemistry from the University of Arizona. In addition, I underwent a four-month training program at the DEA training academy in Quantico, Virginia.

After that four-month training academy I went to the Chicago laboratory and received two months of an in-house training program as well, so cumulatively about six months of training before beginning analysis as a DEA chemist.

Q. And what are your duties and responsibilities as a DEA chemist?

A. As a DEA forensic chemist, my primary responsibility is to analyze evidence submitted to the laboratory for the absence or presence of controlled and noncontrolled substances. I'll write reports based off of my findings. I'll testify in court as needed, and occasionally I assist

with the seizure of clandestine laboratories.
Q. How many drug cases have you worked in your career?
A. Over the past eight years, I've analyzed over roughly 2,000 exhibits.
Q. And is the DEA lab that you work in, is that an accredited laboratory?
A. Yes, the laboratory system is accredited.
Q. And can you explain what that means?
A. An accredited laboratory basically means our work gets scrutinized by outside bodies that give us accreditation, basically holding the reports that I write and the analysis we do in the laboratory to a certain standard.
Q. And do you know how often that accreditation process takes place?
A. The accreditations happen every five years.
Q. And for your drug lab analysis, are there any internal reviews?
A. Yes. Each lab report that we submit as an analyst undergoes a technical review process. So every lab report is reviewed by a second set of eyes, basically, for quality purposes.
Q. What are the DEA's intake procedures for evidence?
A. When evidence comes into the laboratory, it's submitted. It's either hand delivered or sent via mail, certified mail, so that gets delivered into the laboratory.

And then it stays in our evidence vault until it gets assigned to an analyst for analysis.
Q. And what information is included with intake?
A. The information corresponds to the unique pieces of evidence that come in. So when an agent has something that they've seized out in the field, they'll bring it into the lab.
And then that bit of evidence comes in with a unique identifier number that we give it in the lab, in addition to the unique identifier that the case agent has for the case and exhibit number.
Q. And what type of evidence is often submitted to you for analysis?
A. We do all types of drug analysis, so any type of suspected drug that can come in gets analyzed by the laboratory. And, you know, through our analysis we'll determine if there are or are not drugs present in the, in the evidence.
Q. Are you familiar with hypergeometric statistical sampling?
A. Yes.
Q. And what is that?
A. Hypergeometric sampling, it's just a method that we use when we're analyzing the exhibit to help us determine how much of the, how many units we need to test, and it just

pertains to our methodology when we're testing.
Q. And what about GC-MS?
A. GC-MS is a gas chromatography-mass spectrometry. It's a very common instrument we use, that I use, when I'm analyzing exhibits.
Q. And were you the scientist assigned to analyze suspected controlled substances in this case?
A. I was, yes.
Q. And what type of test did you utilize for your analysis?
A. For this exhibit specifically, I did use the GC-MS, the gas chromatography-mass spectrometer. I also used a second instrument called a GC-FID. That's gas chromatography-flame ionization detection. Those two tests are what I used to make my conclusions for this exhibit.
MR. LYNCH: Permission to approach the witness with what's been admitted as Exhibit K3.
THE COURT: You may do so.
BY MR. LYNCH:
Q. I'm showing you what's been admitted as Exhibit K3. Are you familiar with what you are looking at?
A. Yes. I am, yes.
Q. Can you identify what you see?
A. This is the exhibit that I analyzed, and I can see the case information and exhibit number here on this yellow sticker, in addition to there's an evidence label that has

my signature and date from when I received it, opened it, and the date I sealed it is all on here.
Q. And is there a law enforcement item number affixed to the packaging?
A. Yes, there is.
Q. And what is that?
A. For the evidence sticker or the evidence?
Q. Is there a DEA number associated with K3?
A. Yes, there is.
Q. And what is that?
A. It's on this yellow label here IJ222048. And the exhibit number is 2 in this, for this piece of evidence.
Q. And what type of evidence is contained in Exhibit K3?
A. In this exhibit there are blue tablets with markings of M and 30 on them. Blue tablets.
Q. And during your time as a forensic chemist, have you seen pills that look like that before?
A. Yes, I have seen tablets that have the same impressions on them before.
Q. Is that common?
A. These tablets are something that we see with regularity in the lab, yes.
Q. All right. And you testified that you used the GC-MS method to analyze the pills?
A. Yes. That was one of the instruments that I used to

come to my conclusions of the -- what was contained in this exhibit.

Q. And what were your conclusions?

A. I determined that there was Tramadol, P4O fentanyl, fentanyl and acetaminophen present in these tablets.

Q. And based on your report, the pills weighed 2,184 grams, if you recall?

A. For the exact number, I would need to, I do not know that number exactly off of the top of my head.

Q. And we'll go back to that. What's the chemical name of fentanyl?

A. The chemical name is something that we use to report it. I reported it on my DEA 113, which is my laboratory report. However, I do not commonly use its scientific name to refer to fentanyl as fentanyl.

Q. Okay. Is that standard practice, to just refer to fentanyl as fentanyl and not the chemical name?

A. Correct. The chemical name is going to be the different components, the different functional groups that compromise fentanyl. So there's a lot of different components to it. Fentanyl is a much easier, more common way to refer to that compound.

Q. And what is the chemical name, if you know?

A. I do not have the chemical name memorized off the top of my head, but I could refer to it in my lab notes if I needed

to.

MR. LYNCH: And, Your Honor, we're just pulling up Mr. Chavez's report.

BY MR. LYNCH:

Q. Mr. Chavez, did you complete a report associated with your analysis?

A. I did complete a report, yes.

Q. And in that report would the weight of the drugs that you tested be contained?

A. Yes, the weight of the drugs are captured on my report.

Q. And if you saw that report, would that refresh your recollection as to the weight of the blue tablets?

A. Yes, that would.

MR. LYNCH: Your Honor, could we have one minute?

THE COURT: You may.

MR. LYNCH: Thank you.

Apologies. We're almost there, Your Honor.

Permission to approach the witness, Your Honor.

THE COURT: You may do so.

BY MR. LYNCH:

Q. And, Mr. Chavez, do you have your report pulled up?

A. I do, yes.

Q. And what's the weight of the blue, the blue tablets?

A. The weight of the blue tablets for this exhibit is, the net weight is 2024.3 grams.

MR. LYNCH: No further questions. Thank you.

THE COURT: Cross-examination?

MR. RIVERS: No questions from Giles.

MR. WOLD: No questions.

MR. ENGH: No questions.

MS. TURNER: No questions.

MR. ADKINS: Defer the witness, Your Honor.

THE COURT: You may step down, sir. Thank you.

(End of excerpt requested)

* * *

I, Renee A. Rogge, certify that the foregoing excerpt is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR