UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160(16) (NEB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

GREGORY BROWN
a/k/a "Lil' G,"

Defendant.

**GOVERNMENT'S SENTENCING POSITION**

*"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

For over 20 years, the Highs street gang attempted to hijack much of north Minneapolis. It converted public spaces into open-air drug markets, preyed on vulnerable youths, and normalized the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

Defendant Gregory Brown was a known and active participant in the Highs criminal enterprise.[1] He participated in the enterprise's fentanyl trafficking as a high-level and respected Highs member that preyed on the vulnerability of younger, more

[1] For each defendant in this matter, the government will simultaneously file a sealed letter to the Court outlining additional information regarding each defendant's broader role in the Highs criminal enterprise.

impressionable members. Brown's conduct contributed to the fear, instability, and harm that the Highs inflicted on the community. His sentence should reflect the seriousness of the offense, promote respect for the law, protect the public, effectuate necessary deterrence. For the reasons discussed below, the government requests that the Court impose an upward variance to a guidelines range of 140-175 months.

**<u>The Highs Criminal Enterprise</u>**

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:




*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows

have engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise.

Its members resort to any crime—murder, kidnapping, arson, robbery, bribery, extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:




*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and

Walgreens have been essentially open-air drug markets.[2] The Highs stranglehold on this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:




*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community. Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 “shots fired” calls;
- 20,265 ShotSpotter activations;

---

[2] This Walgreens location has since closed, in part due to the Highs activities in and around its location. This is a representative example of how the enterprise can affect the economic health of communities.

- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product—requires no introduction. According to the Minnesota Department of Health, in 2022, Minnesota reported 4,228 non-fatal opioid-involved overdoses.[3] Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[4] Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[5] Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident. The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

**Gregory Brown's Offense Conduct**

Defendant Gregory Brown spent years as a respected member of the Emerson Murder Boys ("EMB") clique of the Highs.[6] The Highs dubbed him "Lil G," and he was

---

[3] Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.

[4] *Id.*

[5] Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

[6] Cooperating defendants testified about Gregory Brown's membership and role in the Highs.

a drug supplier and respected amongst its members. Brown's role as a supplier enabled the Highs gang to carry out its operations. Highs members, particularly after 2019-2020, made a significant amount of money selling fentanyl pills and other drugs. Highs members used that money to buy firearms, which then in turn were used to shoot at rival gang members. As all five trials demonstrated, violence between the Highs and their rival gang was not limited to its participants. The violence between the two gangs resulted in numerous innocent deaths and injuries. High-level suppliers of fentanyl pills, like Brown, were the lifeblood of the Highs and provided them the capacity to carry out violent operations. Aggravating matters, Brown often utilized younger members to carry out the day-to-day of his drug operation while he profited. Brown also supplied younger, violent members of the Highs with firearms on mor than one occasion. Brown's pattern of conduct, stretching across years, reveals a man unmoved by prior arrests or leniency, committed wholly to exploiting his relationship with the Highs to make money and, in turn, spread chaos and despair in the community.

## **The Appropriate Sentence**

### A. The Applicable Law

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature

and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

**B. The Presentence Investigation**

The Presentence Investigation Report ("PSR") stated that Brown is an Offense Level 19 and a Criminal History Category VI. The PSR calculated an advisory range of a 63 to 78 month term of imprisonment. PSR at ¶ 97. For the reasons outlined below, the government believes that probation mistakenly weighed and calculated the guidelines. Because of this, justice demands an upwards variance to a range of a 140 to 175 month term of imprisonment.

Brown was convicted of RICO Conspiracy under 18 U.S.C. § 1962(d). The jury found that Brown agreed to participate in the conduct of the affairs of the Highs criminal enterprise. The foundation of the Highs enterprise was drug trafficking. Testimony and the evidence demonstrated that Brown was a part of the Highs enterprise and its drug operation. Utilizing the preponderance standard, at a minimum, an Offense Level 22 should apply under U.S.S.G. §2D1.1(c)(9) because the evidence showed Gregory Brown was responsible for distributing, possessing with the intent to distribute, and/or conspiring to distribute "at least 32 grams but less than 40 grams of fentanyl."

Furthermore, the evidence supported a +4 enhancement under U.S.S.G. §3B1.1(a) (aggravating role) as well as the +2 firearm enhancement under U.S.S.G. §2D1.1(b)(1). With that, Brown would be an Offense Level 28 and Criminal History Category VI.

The applicable guidelines range would be a 140 to 175 month term of imprisonment. Brown was a feared and respected member of the Highs whose product and firearms kept the gang alive and functioning. The additional enhancements and resulting guidelines are consistent with the Guidelines' assessment of the gravity of Brown's crimes, protects the public, promotes respect for the law, and effects much needed deterrence. Due to that, an upwards variance is appropriate. The government respectfully requests a sentence in the range of 140 to 175 months for Brown.

<u>A base offense level of 22 should apply based on the quantity of fentanyl Brown possessed with the intent to distribute.</u>

The government believes an Offense Level 22 should apply under U.S.S.G. §2D1.1(c)(9) because Gregory Brown was responsible for distributing, possessing with the intent to distribute, and/or conspiring to distribute "at least 32 grams but less than 40 grams of fentanyl." As discussed, Gregory Brown's agreement to participate in the Highs gang, specifically his involvement with drug trafficking, would not constitute acquitted conduct as it pertains to RICO Conspiracy. There was substantial evidence at trial showing that it was more likely than not that Greogry Brown was responsible for distributing, possessing with the intent to distribute, and/or conspiring to distribute at least 32 grams of fentanyl:

- Brown was arrested in 2021 with 29 fentanyl pills. *See* PSR, ¶ 18.

- Highs members made multiple trips from Minneapolis to Phoenix to obtain fentanyl pills to re-distribute in Minneapolis. From July 1, 2021 through June 21, 2022, Brown took at least 11 round trip flights between Minneapolis and Phoenix. Testimony and investigative materials revealed Brown had supplied and distributed thousands of fentanyl pills. *See* PSR, ¶ 32.
- Cooperating defendant Avante Nix traveled with Gregory Brown in November 2021 and they obtained 50,000 fentanyl pills from a supplier. Brown taught Nix how to package and ship fentanyl pills for re-distribution in Minneapolis. Brown an Nix discuss supply runs in multiple text messages. *See* PSR, ¶¶ 33-34.
- Gregory Brown moved to Houston, Texas. While in Texas, Nix traveled to obtain fentanyl pills from Arizona for re-distribution in Minneapolis on Brown's behalf. Nix typically purchased 50,000 fentanyl pills per trip. *See* PSR, ¶ 33.

<u>A +2 enhancement against Brown for possessing firearms in connection with drug distribution.</u>

The government believes a +2 enhancement should apply under U.S.S.G. §2d1.1(b)(1) because there was evidence at trial that the defendant possessed a firearm as part of his relevant conduct. The following evidence demonstrated Brown's possessing and distributing firearms:

- Jovan Knight testified that Gregory Brown was one of the more respected members of the Highs because he did everything…he got money, and "he shoot if necessary." *See* ECF No. 2169 at 1285.
- Beyond drugs, Avante Nix testified that Brown supplied him and other Sayless members of the Highs with draco-style firearms. *Id.* at 91-92.

- Brown rapped about supplying Nix and others with draco-style firearms in "Traumatized Part 2." Brown rapped about Sayless and said "gave them n****s drakes (draco-style firearms), they gave me hate." Nix testified that Brown was referencing him and Sayless clique members. *Id.* at 92.
- Jovan Knight testified that Brown supplied Highs members with firearms. *See* ECF No. 2169 at 1648.
- Nix specifically testified that Gregory Brown supplied him with firearms while he worked with Brown to distribute fentanyl pills. See ECF No. 2134 at 92.

<u>A +4 enhancement should apply under U.S.S.G. §3B1.1 because there was substantial evidence at trial that Brown was "an organizer or leader of criminal activity."</u>

The government believes a +4 enhancement should apply under U.S.S.G. §3B1.1(a) because there was evidence at trial that the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

There was significant evidence at trial that Brown was an organizer or leader of criminal activity. An adjustment is warranted under U.S.S.G. § 3B1.1 in the case of a "defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." *See* U.S.S.G. § 3B1.1, n.2. The evidence at trial showed that Gregory Brown exercised management responsibility over large quantities of fentanyl that were distributed to Highs members.

While Brown was a well-respected drug supplier in the Highs gang, his leadership role was not limited to his involvement with drug trafficking. Highs members selling

drugs is simply a means to an ends. The following evidence presented at numerous trials evidenced Brown's respect and leadership role in the Highs gang beyond even drug trafficking:

- Cooperating defendant Jovan Knight testified that position in the Highs is based on reputation and respect. *See* ECF No. 2169 at 1285.
- During Trial 2, Jovan Knight testified that "putting in work" benefits you with the Highs because your reputation goes up. Knight testified that position in the Highs is based on respect and there are benefits based on the amount of respect you have. *See* ECF No. 2050 at 43-45.
- Cooperating defendant Christopher Johnson, Sr. testified Gregory Brown is one of the respected members of the Highs. He testified Gregory Brown is a high-level drug trafficker. *See* ECF No. 2262 at 812, 814.
- Cooperating defendant Avante Nix testified that Highs members gain rank and position in the gang by putting in work, which could be selling drugs. *See* ECF No. 2134 at 27.
- Jovan Knight testified that Gregory Brown was one of the more respected members of the Highs because he did everything…he got money, and "he shoot if necessary." *See* ECF No. 2169 at 1285.
- Avante Nix testified that Gregory Brown was one of the respected members of the Highs. *See* ECF No. 2134 at 29.
- Avante Nix testified that Gregory Brown supplied him and other Sayless members of the Highs with draco-style firearms. *Id.* at 91-92.

- Gregory Brown rapped about supplying Nix and others with draco-style firearms in "Traumatized Part 2." Brown rapped about Sayless and said "gave them n****s drakes (draco-style firearms), they gave me hate." Nix testified that Greogry Brown was referencing him and Sayless clique members. *Id.* at 92.
- Jovan Knight testified that Gregory Brown supplied Highs members with firearms. *See* ECF No. 2169 at 1648.

Gregory Brown's leadership role in the Highs went beyond drugs. Gregory Brown was actively involved in supplying Highs members with firearms. There was significant evidence at trial that Gregory Brown was an organizer or leader of criminal activity that involved well over five or more participants. Specifically, there was testimony and evidence that Gregory Brown was a high-level supplier of fentanyl pills. Gregory Brown supplied well over five members of the Highs with fentanyl pills, which would then be sold at the intersection of Broadway and Lyndale.

- Trial testimony that Gregory Brown supplied fentanyl pills to Avante Nix, Clinton Brown, Deandre Poe, Christopher Johnson, Sr., Douglas Mobley, and others.
- Cooperating defendant Clinton Brown testified that Gregory Brown supplied him with fentanyl pills. *See* Trial 3, Volume IV at 888, 890, 891.
- Cooperating defendant Christopher Johnson, Sr. testified that Gregory Brown supplied him with fentanyl pills. *See* ECF No. 2262 at 890.
- Cooperating defendant Chris Shaw testified that Gregory Brown brough a lot of fentanyl pills to Minnesota from Arizona. *See* No. 2263 at 1347-1348.

- Cooperating defendant Avante Nix testified that Gregory Brown supplied him with fentanyl pills, fronted him money to meet with the supplier of fentanyl pills in Arizona, and shipped fentanyl pills back to Minneapolis for re-distribution. *See* ECF No. 2134 at 60-68.
- Nix testified that Gregory Brown also supplied fentanyl pills to Clinton Brown and Deandre Poe for redistribution. *Id.* at 83-88.
- Special Agent Matt Schommer went through Highs associate Damone Rhodes's cell phone extraction (Exhibit A-190), which contained messages between Gregory Brown and Rhodes about Brown re-supplying Rhodes with pills. Damone Rhodes was a well-known fentanyl distributor and was being supplied by Gregory Brown. See Exhibit A-190. In a Facebook direct message, Gregory Brown (Odd Frenchies) messaged with Damone Rhodes (Steve Drive). Agent Schommer testified about these messages. Damone Rhodes told Gregory Brown on October 18, 2021 that "I just ran thru them joints on bd I need the same thing." There was testimony from Agent Schommer that based on the context, this was a reference to Brown supplying Rhodes with fentanyl pills. See Exhibit A-95 at 31. Agent Schommer went through a direct conversation message between Gregory Brown (Odd Frenchies) and Highs member Christopher Finch (Jankysko Frm Booway). In the message from August 15, 2021, Finch messaged Brown "if you not trynna gimme the pills (fentanyl pills) rn lmk (let me know) bro I got stains (customers)." *Id.* at 36. This is additional evidence of Gregory Brown supplying Highs with pills.

Furthermore, the evidence at trial showed that Brown was an organizer or leader of criminal activity that was "otherwise extensive." According to U.S.S.G. §3B1.1, n.3, "in assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."

- There was significant evidence and testimony during all of the trials about Highs suppliers obtaining fentanyl pills in Arizona for re-distribution in Minneapolis. Several cooperating defendants identified Gregory Brown as one of those Highs suppliers. Several cooperating defendants testified that fentanyl pills obtained from Arizona would then be sold by Highs members or associates directly to customers in the Broadway and Lyndale area. The Highs gang and its drug trafficking operation was clearly "otherwise extensive." Gregory Brown was a respected leader in the Highs gang.

**C. The Guidelines**

**1. Nature and Circumstances of the Offense**

Brown provided the product that turned a neighborhood gas station and several convenience stores into open-air drug markets. Brown's fentanyl distribution involved mid-level suppliers and drug customers on numerous occasions and "could be considered extensive." Suppliers, like Brown, were the lifeblood of the Highs fentanyl trafficking operation. Aggravating matters, Brown also supplied younger, violent members of the Highs with firearms.

The government believes the applicable guidelines for Brown are Offense Level 28 and Criminal History Category VI. The applicable guidelines range would be a 140 to a 175 month term of imprisonment. The government believes that a guidelines sentence is appropriate.

**2. History and Characteristics of the Defendant**

Brown is an EMB member of the Highs, publicly aligning himself via social media. As testimony from all five trials demonstrated, EMB members generally consisted of older members. Many EMB members, like Brown, Calvin Wright, and Deandre Poe, were involved with fentanyl trafficking. Brown often utilized younger, more vulnerable Highs members to distribute his product.

Brown, a Criminal History Category VI, is a menace to society whose record reflects an unbroken allegiance to criminality. PSR at ¶¶ 39-70.

**3. The Need for the Sentence to Reflect Seriousness, Promote Respect for the Law, and Provide Just Punishment**

Brown's conduct mocks the law. Respect for the law requires accountability commensurate with harm. A strong, long-term sentence reaffirms that the law's protection of life is not negotiable, and that brazenly pushing dangerous drugs to younger gang members and the community at large will not be tolerated.

**4. Deterrence—Specific and General**

Brown's role and position was essential to the Highs operations. Without older, respected members like Brown, the Highs would not have been able to run and manage the open air drug markets at Broadway and Lyndale.

The Highs not only glorified violence and measured loyalty in blood, but they pushed and peddled dangerous drugs into the community. No drug had a more devastating impact than fentanyl. An upwards variance to a guidelines range applicable to an Offense Level 28 is appropriate and supported by the evidence.

This will communicate clearly to this defendant, to his peers, and to his successors that brazen, open-air, disrespect for the law that takes human life and leaves entire communities shattered will be met with commiserate consequences. That message is essential to interrupt the calculus that created the ecosystem that allowed for the open air drug markets in north Minneapolis.

**5. Protection of the Public**

Public safety is paramount. The data from North Minneapolis tell a stark story: thousands of shots-fired activations, hundreds of gunshot victims, and a spiraling death toll—conditions materially aggravated by the Highs' campaigns. However, there is another side of the Highs. The Highs pushed fentanyl and other drugs to desperate addicts. The Highs drug operation ruined the lives of individuals, their families, and wrought havoc on the surrounding area. The money that Highs members made from selling drugs allowed them to purchase the guns that they used to target rival gang members. The drug trade allowed the Highs to maintain and continue the violent elements of their enterprise. Removing a respected, wholesaler from the community reduces the operational capacity of the enterprise. Brown has demonstrated ongoing dangerousness. There is no credible basis to assume risk abatement outside long-term incapacitation.

### 6. Avoiding Unwarranted Disparities

A strong sentence aligns with the culpability of the highest-impact Highs offenders, those who supply the gang, run the operation, and differentiates them from lesser participants. Anything less would invert proportionality by treating a respected and large-scale supplier more favorably than those with narrower roles.

## Conclusion

The Court must impose a sentence sufficient, but not greater than necessary to serve the purposes of sentencing. In a case of a large-scale fentanyl supplier and respected associate of the gang, only a strong guidelines sentence satisfies the factors outlined in 18 U.S.C. § 3553(a). Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, powerfully deters, and most critically protects the public from a proven, unrepentant enterprise shooter.

For all these reasons, the government respectfully submits that a Guidelines sentence of life imprisonment fully comports with the United States Sentencing Guidelines and the factors of 18 U.S.C. § 3553(a).

Dated: April 3, 2026

Respectfully Submitted,

DANIEL A. ROSEN
United States Attorney

*/s/ Brian W. Lynch*
Brian W. Lynch
Trial Attorney
Violent Crimes and Racketeering Section
U.S. Department of Justice
Washington, DC 20530